IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 26, 2022 Session

## STATE OF TENNESSEE v. KENYON DEMARIO REYNOLDS, ALIAS

**Appeal from the Criminal Court for Knox County**
**No. 106800B    Bob R. McGee, Judge**

_____

### No. E2021-00066-CCA-R3-CD
_____

Aggrieved of his Knox County Criminal Court jury convictions of second degree murder, delivery and sale of a Schedule I controlled substance, and unlawful possession of a firearm, the defendant, Kenyon Demario Reynolds, appeals, arguing that the trial court erred by denying his motion to sever the charges, denying his motion to suppress evidence, providing an incorrect jury instruction, and failing to merge two firearm convictions. Because the trial court erred by failing to merge Counts 13 and 14, we remand the case for merger of those counts and entry of corrected judgment forms. We affirm the trial court's judgments in all other respects.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gerald L. Gully, Jr., Knoxville, Tennessee (on appeal); and Clinton Frazier, Assistant District Public Defender (at trial), for the appellant, Kenyon Demario Reynolds.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez and Kenneth Irvine, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Knox County Grand Jury charged the defendant[1] by presentment with 10 counts related to drug distribution and the overdose death of the victim, Jessica Lyday.

_____
[1]    Two co-defendants, Sarah Elizabeth Covington, Alias, and Justin Frederick Lee, Alias, were also charged.

The charges were as follows:

| Count[2] | Offense Date | Charged Offense |
| --- | --- | --- |
| 1 | July 3, 2015 | Second degree murder of Jessica Lyday via unlawful distribution of a Schedule I controlled substance |
| 3 | July 2, 2015 | Delivery of less than 15 grams of a Schedule I controlled substance |
| 4 | July 2, 2015 | Sale of less than 15 grams of a Schedule I controlled substance |
| 7 | July 6, 2015 | Delivery of less than 15 grams of a Schedule I controlled substance within 1,000 feet of a park |
| 8 | July 6, 2015 | Delivery of less than 15 grams of a Schedule I controlled substance within 1,000 feet of a park |
| 9 | July 6, 2015 | Possession with intent to deliver more than 15 grams of a Schedule I controlled substance within 1,000 feet of a school |
| 10 | July 6, 2015 | Possession with intent to sell more than 15 grams of a Schedule I controlled substance within 1,000 feet of a school |
| 12 | July 6, 2015 | Possession of a firearm with the intent to go armed during an attempt to commit a dangerous felony and with prior felony convictions |
| 13 | July 6, 2015 | Possession of a firearm with a prior felony conviction involving the use of force |
| 14 | July 6, 2015 | Possession of a handgun with a prior felony drug conviction |

At the close of the State's case in chief and upon the defendant's motion for a judgment of acquittal, the State agreed that it had not established that the defendant had possessed more than 15 grams of heroin in a drug-free zone, and the court struck the language of Counts 9 and 10 as to the quantity of heroin.

The victim's mother, Jan August Lyday,[3] testified that the victim began "a

---

[2] Only the charges against the defendant are included here.
[3] For clarity, we will refer to the victim as "the victim" and her mother as "Ms. Lyday."

close relationship" with Justin Lee when she was a junior in college. Ms. Lyday said that the victim had struggled with opioid addiction since the age of 25 and that she had "fought very hard" to overcome her addiction, going into rehabilitation twice. At the time of her death, the victim had completed a month-long process to gain admittance to Mercy Ministries, a year-long treatment program in Nashville. On July 2, 2015, the victim had "the final interview" with the program, and Ms. Lyday was preparing to take the victim to Nashville to begin the program the next day. On the morning of July 3, 2015, Ms. Lyday found the victim "in the tub and . . . her nose was under the water." Ms. Lyday and Ms. Lyday's brother pulled the victim from the bathtub and into the living room, and Ms. Lyday's brother performed CPR while Ms. Lyday called 9-1-1. The victim did not survive.

Knoxville Police Department ("KPD") Investigator Philip Jinks testified as an expert in narcotics investigations. When he arrived to Ms. Lyday's house, the deceased victim was still lying on the living room floor. He photographed and collected evidence from the scene, including the victim's two cellular telephones, a spoon with "a small piece of cotton," and a belt that "was pulled through the buckle to make a loop." He explained that intravenous drug users commonly use a "belt like that as a tourniquet when they're preparing to shoot up" and will heat the substance in the spoon and use a small piece of cotton "to filter out any solid particulates" when they "draw the substance into the syringe." Investigator Jinks noticed "track marks" on the victim's arms and "a plastic baggy" about the size of a postage stamp stuck to the victim's body, which baggies he said were common among "drug distributors." He found numerous other "stamp baggies" in the victim's bedroom. He found a box of "Tennessee lottery ticket play slips," which he explained were commonly used to package a "point," "or one tenth of a gram of heroin." He said that the street value of one gram of heroin is "typically . . . around $200" and that one point of heroin would sell for $25 to $35.

Investigator Jinks explained that, because of the nature of addiction, it was uncommon for a heroin user to purchase "a large amount and hold onto it and use it throughout the week or even throughout the day." Instead, he said, users "get what they can, [and] use it as quickly as they can." He did note, however, that users would commonly pool their money to purchase a gram of heroin at a cheaper price and divide the product among them.

Investigator Jinks searched the victim's cellular telephone and discovered that her last contact was with Mr. Lee on July 2, 2015. In that text conversation, the victim told Mr. Lee "that she had $100," and the two arranged to meet at a Walgreens. On July 6, 2015, Investigator Jinks went to Mr. Lee's house at 713 Aeronca Road, where he found Mr. Lee "in very poor health" and preparing to go to the hospital. When Investigator Jinks told Mr. Lee that the victim had died, Mr. Lee "became very emotional." The investigator seized Mr. Lee's cellular telephone before leaving and went to Walgreens to collect video

surveillance footage. Mr. Lee's telephone "rang constantly," and the caller was identified on the telephone as "Slim," whom Investigator Jinks later identified as the defendant. At some point, the defendant texted Mr. Lee, telling him to check his mailbox, and Investigator Jinks discovered a series of text messages between Mr. Lee and the defendant, indicating that Mr. Lee and the defendant had used Mr. Lee's mailbox "as kind of a conveyance for drugs and money."

Investigator Jinks returned to Mr. Lee's house later that evening and recovered heroin from Mr. Lee's mailbox, which he determined was an amount of heroin intended to make up for a shortage from "an earlier purchase." At that point, Mr. Lee agreed to cooperate in a controlled buy and called the defendant "to order two grams of heroin" for $360. During the call, the defendant "advis[ed] Mr. Lee that this was not the highest quality heroin" and that "he was going to throw some extra in." An officer placed marked bills in Mr. Lee's mailbox, and "several officers set up surveillance around . . . the mailbox and around the house." Investigator Jinks "saw a silver Pontiac Grand Prix" stop at Mr. Lee's mailbox and "saw an arm come out, go in the mailbox, then the car drove away." While other officers followed the Grand Prix, Investigator Jinks recovered a bag of heroin from the mailbox and informed the other officers that the controlled buy was complete.

One of the officers that followed the Grand Prix effectuated a traffic stop when the vehicle pulled into the driveway of 1012 Morrell Road. When the officer pulled in behind the car and activated the blue lights, the defendant "[i]mmediately, opened the driver's door of the Grand Prix and ran on foot," dropping a cellular telephone outside of the vehicle. Officers apprehended the defendant as he hid in some bushes in a wooded area behind the house. The defendant had removed his shorts and tee shirt as he ran, and inside a pair of black shorts discarded nearby, Investigator Jinks recovered the $360 of marked bills used in the controlled buy. Investigator Jinks used his telephone to call the telephone number identified as belonging to "Slim," and the cellular telephone that the defendant dropped rang with an incoming call from Investigator Jinks's number. The defendant initially identified himself as "Tony Battle."

Upon realizing that, despite "marked police cars and a lot of blue lights and sirens, no one had come out of the house . . . to see what was going on," Investigator Jinks knocked on the front door "just to let the resident know that everything was safe and there was no reason to be concerned." At that point, he did not know that the defendant had any connection to the house. "I thought that was just a convenient place for him to pull over and jump out of the car and run." A woman, who identified herself as "Savannah Parker," answered the door and told the investigator that she did not recognize the Grand Prix. Investigator Jinks "noticed the odor of marijuana inside the house." The woman "went back inside the house and closed the door," and Investigator Jinks believed that she did not

want to interact with police but, otherwise, did not believe that she had any connection to the defendant.

While searching the defendant's vehicle, an officer "reached into the car and pressed the button on a garage door opener that was laying in the driver's seat. And the garage door opened at 1012 Morrell Road." After learning that the defendant's vehicle was associated with the house, Investigator Jinks arrested the woman for giving a false statement and learned that her name was Sara Covington. Ms. Covington told the officers that two small children were inside the house, and Investigator Jinks "[o]bviously . . . was concerned for their well-being[]" and "call[ed] for the children to come out. And two very small, maybe three- and five-year-old children came to the door." He then entered the house "to ensure there were no other children" and to secure the house.

After obtaining a search warrant, Investigator Jinks searched the house and recovered a loaded Taurus "semi-automatic pistol" from under a mattress and a "loaded pistol magazine" from "the bottom drawer" of a dresser in the defendant's bedroom. He also recovered numerous items related to the sale and distribution of drugs. In a closet, he found a soft-sided cooler containing "a large amount of currency that was banded in rubber bands" totaling "just over $43,000," "a bag containing a brown substance" that was later determined to be 14.45 grams of heroin, and a second bag containing a brown, powdery substance that was later determined to be a noncontrolled substance. Investigator Jinks believed the substance to be "some type of dietary supplement" used as "a cutting agent" to "increase the yield" of the heroin. Behind the cooler, he found more cash and a digital scale with "kind of a tan powder" on it that was "consistent with heroin." He also discovered two "inoperable" cellular telephones, a bag of multi-colored rubber bands consistent with those used on the bundled cash, and a Gucci bag containing "a coffee grinder" and "a cylinder press" in the defendant's bedroom. Investigator Jinks explained that heroin is "a very rocky-type substance" that must be ground into a powder before mixing it with the cutting agent. After grinding and mixing the product, dealers "put that substance into a press," such as "a cylinder press," to compress the powder "into a small compact cylinder" for concealment and transportation. He also found a bag with the logo of a company that sells "little stamp bags." Inside a kitchen cabinet, he discovered a digital scale with "a tan or white, powdery substance" on it and "a bottle of Super Mannitol, which is like a dietary supplement" that is "often used as [a] cutting agent[] for controlled substances."

KPD Investigator John Holmes testified that he interviewed the defendant after his arrest and that the defendant admitted distributing heroin.

Justin Lee testified that he had dated the victim "off and on" between 2007 and 2009 and that they "knew each other mainly through drug use." He acknowledged that

he facilitated the victim's purchasing heroin from the defendant. He said that on July 2, 2015, the victim contacted him to obtain heroin because she knew that he "was in contact with Slim." When the victim texted Mr. Lee that she had $100 to celebrate July 4th, he called the defendant "[t]o facilitate a buy between me and her through him." Mr. Lee explained that when he purchased heroin from the defendant, "I would put the money in the mailbox," and the defendant "would drive up and do the swap, [and] leave the heroin in the mailbox." Mr. Lee met the victim at Walgreens and collected her $100. He texted the defendant that he would be home by approximately 9:00 p.m. with the money. He placed the victim's $100 and $80 of his own money inside the mailbox, which amount he said would purchase one gram of heroin. He said that the defendant delivered only one-half gram of heroin that night, explaining, "[I]t was very strong. It was the A1. I don't know exactly why it was lighter, but [the defendant] said he would bring me the rest." He returned to Walgreens to give the victim a "little over half" of the heroin, telling her "to be careful" because it "was very strong." He said that on July 6, the defendant delivered an amount of heroin that "was the makeup from four days earlier."

Sara Covington testified that in July 2015, she and the defendant were in a relationship and lived together at the house on Morrell Road. She said that the defendant was involved in the sale and distribution of heroin. She said that the Gucci bag recovered from the house belonged to the defendant and that he kept "all type of knickknacks and stuff" in it. She also said that the gun and the loaded magazine clip belonged to the defendant. She said that the defendant would use the rubber bands "to gather his money" and would use the scales to weigh "[h]eroin or cocaine." She said that the defendant would grind the heroin in the coffee grinder, mix it with the Mannitol substance, and form it with the cylinder press.

Donna Roach from the Knoxville, Knox County, KUB Geographic Information Systems testified as an expert in geographic information systems. She determined that 1012 Morrell Road was within 1000 feet of Rocky Hill elementary school and that 713 Aeronca Road was within 1000 feet of the Luxmore Natural Area.

Knox County School Security Sergeant Herbert Boles testified that Rocky Hill Elementary was an accredited and functioning school on July 2, 2015.

Angie Davidson of Knoxville Parks and Recreation testified that the Luxmore Natural Area was an established park in July 2015.

Doctor Darinka Mileusnic-Polchan performed the victim's autopsy and testified as an expert in forensic and anatomical pathology. She determined that the victim's cause of death was "heroin intoxication" and that the manner of death was "accident." She identified "signs of [ongoing] intravenous drug abuse" on the victim's

body. She ruled out drowning as a contributing cause of death.

Susan Crookham, a "certified scientist" with the National Medical Service, testified that she reviewed the results of the victim's blood tests and toxicology reports and confirmed that the victim's body was metabolizing heroin at the time of her death.

The parties stipulated that the defendant "had a prior dangerous felony conviction," "a prior felony conviction that involve[d] the use of force," and "a prior felony conviction involving drugs."

The State rested and, after a *Momon* colloquy, the defendant elected to testify.

The defendant testified that in July 2015, he lived at the house on Morrell Road with Ms. Covington. He said that the drugs found in his house "came from a list of people. Drugs is not a one-person thing." He said that he got his drugs from "a guy named Mechanic" and acknowledged that part of the drugs in the house were his but said that it was impossible to identify who all the drugs in the house belonged to. He also said that only $11,000 of the cash found in the house was his and that only $7,000 of that came from the sale of heroin. He denied that the gun or the magazine clip was his and said that he did not even know that they were in the house. He said that he was also unaware of the cooler of cash found in a closet. When asked whether he sold heroin out of the house on Morrell Road, he replied: "I wouldn't say I was selling out of that house," explaining that he did not use the house as a point of delivery. Instead, he would "ride around with it on me" and "[w]hen my phone ring, I go."

He denied that he used the coffee grinder or cylinder press for heroin and said that he did "[n]ot necessarily" use the scales to weigh heroin because "[a]fter so long, you can just pretty much eyeball it." He said that he would cut the heroin with "a noncontrolled substance," put it in the corner of "a sandwich baggie," "sprinkle water on it[,] and tie a tight knot," causing the substance "to dry up."

The defendant said that he received several telephone calls from Mr. Lee on July 2 but that he avoided the calls and "tr[ied] to rush him off the phone" because the defendant was in the middle of "shooting dice." When Mr. Lee called him back later that night, the defendant told him to "hit me back in the morning." He said that he met up with Mr. Lee on July 3 and that he "took . . . the initiative -- I did sell him something." He said that on July 6, Mr. Lee called him at approximately 11:00 p.m., requesting two grams of heroin. He said that he delivered a two-gram "rock" of heroin to Mr. Lee's mailbox at approximately 11:30 or 11:45 p.m. He denied making two deliveries to Mr. Lee on July 6. After leaving Mr. Lee's house, he returned to his house on Morrell Road, and when an

officer pulled in the driveway behind him, he ran because "I was high as hell, Man. And I seen them blue lights and they scared the shit out of me."

The defendant rested.

The jury accredited the State's evidence and found the defendant guilty as charged of all counts. The trial court imposed an effective sentence of 37 years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a notice of appeal. In this appeal, the defendant argues that the trial court erred by denying his motion to sever Counts 7, 8, 9, 10, 12, 13, and 14 from the remaining counts; by denying his motion to suppress evidence recovered from an illegal search of his vehicle; by improperly instructing the jury as to Counts 13 and 14; and by failing to merge Counts 13 and 14. We consider each claim in turn.

*I. Severance*

The defendant contends that the trial court erred by failing to sever Counts 7-10 and 12-14 from Counts 1, 3, and 4, arguing that the events occurred several days apart and were "not part of a common scheme or plan," that the evidence related to Counts 1, 3, and 4 would be excluded as to the other counts if severed, and that severance was necessary "'to promote a fair determination of [the defendant's] guilt or innocence of each offense.'" *See* Tenn. R. Crim. P. 14(b)(2)(A). The State argues that the events were a single criminal episode subject to mandatory joinder and that the same evidence was admissible as to all counts.

Before trial, the defendant moved for severance, and the trial court held a hearing on the motion. The defendant did not call any witnesses but argued that joinder was permissive; that the events were not part of the same transaction, continuing plan, or conspiracy; and that the evidence related to Counts 1, 3, and 4 was highly prejudicial as it related to the other counts. The State argued that joinder was mandatory because the events were part of the same criminal episode and one course of conduct. The trial court denied the defendant's motion, finding that joinder was mandatory because the events were "all part of one continuing course of conduct."

The State argues on appeal, issues of mandatory joinder under Tennessee Rule of Criminal Procedure Rule 8 should be reviewed for an abuse of discretion; however, our supreme court has held otherwise. When reviewing a claim regarding the mandatory joinder provision of Tennessee Rule of Criminal Procedure 8(a), this court is bound by the factual findings of the trial court unless the evidence preponderates against them, *see State v. Baird*, 88 S.W.3d 617, 620 (Tenn. Crim. App. 2001), but we review "de novo with no presumption of correctness" the trial court's application of the law to the facts, *State v.*

*Johnson*, 342 S.W.3d 468, 471 (Tenn. 2011) (applying de novo review to the trial court's "application of [Rule] 8 to the undisputed facts"); *State v. Brandon Churchman*, No. W2013-00175-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, Apr. 28, 2014).

"Before a trial court may deny a severance request, it must hold a hearing." *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). Because the determination whether multiple offenses should be joined or separated for trial establishes a format for trial, the issue obviously must be presented and resolved before trial. *See Garrett*, 331 S.W.3d 392, 403 (Tenn. 2011); *see also* Tenn. R. Crim. P. 13(b) (providing that a trial court may order severance of offenses before trial); Tenn. R. Crim. P. 14(a)(1)(A) (providing that a defendant, except in the event of a later arising ground, shall move to sever offenses "before trial"). The trial court must base its decision regarding severance on "the evidence and arguments presented at the hearing," and, as a result, our review on appeal is limited "to that evidence, along with the trial court's findings of fact and conclusions of law." *Spicer*, 12 S.W.3d 438, 445 (Tenn. 2000); *see also Garrett*, 331 S.W.3d at 404 (supreme court conducted its "analysis on the basis of the evidence adduced at [the d]efendant's trial instead of only the evidence adduced at the hearing" because the trial court failed to hold a pretrial hearing).

Tennessee Rule of Criminal Procedure 8 governs both mandatory and permissive joinder of offenses. Pursuant to that rule, offenses must be joined if they are:

> (A) based on the same conduct or arise from the same criminal episode;
>
> (B) within the jurisdiction of a single court; and
>
> (C) known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s).

Tenn. R. Crim. P. 8(a). Multiple offenses arise from the same criminal episode only when "proof of one offense necessarily involves proof of the others." *State v. Johnson*, 342 S.W.3d 468, 475 (Tenn. 2011) (citing 2 ABA Standards for Criminal Justice § 13–1.3 cmt., at 13.10). Stated differently, "the proof of one offense must be 'inextricably connected' with the proof of the other or . . . the proof of one offense [must] form[] a 'substantial portion of the proof' of the other offense." *Id.* (citations omitted).

Additionally, offenses *may* be joined for trial if "(1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). Our supreme court has identified "three types of common scheme or plan

-9-

evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *Garrett*, 331 S.W.3d at 404 (quoting *State v. Shirley*, 6 S.W.3d 243, 248 (Tenn. 1999)).

Regardless whether the joinder of offenses was mandatory or permissive in any given case, the defendant may file for a severance of offenses pursuant to Tennessee Rule of Criminal Procedure 14. In cases of mandatory joinder, when the defendant asks for a severance prior to trial, "the court shall grant a severance of offenses . . . when the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2). In cases of permissive joinder, "the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

Relevant to permissive joinder of offenses, our supreme court has observed,

> the "primary issue" to be considered . . . is whether evidence of one offense would be admissible in the trial of the other[s] if the . . . offenses remained severed. In its most basic sense, therefore, any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is "really a question of evidentiary relevance."

*Garrett,* 331 S.W.3d at 402 (citations omitted). Because joining offenses involves admitting proof of crimes committed on one occasion while attempting to prove crimes committed on a separate occasion, the provisions of evidence rule 404(b) are implicated. *Id.* That rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Such "other purposes" include "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." *Id.*, Advisory Comm'n Commts. Because of "the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge," *see* Garrett, 331 S.W.3d at 402, "any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant," *see id.* at 403.

Here, the charges in Counts 1, 3, and 4 arose from the defendant's selling heroin to Mr. Lee on July 2. Counts 7 and 8 arose from the defendant's selling heroin to Mr. Lee on July 6 during the controlled buy. The remaining charges arose from the

defendant's possessing heroin and a firearm in his house on July 6. Because the charges arose from distinct acts, the conduct must have been part of the same criminal episode to be subject to mandatory joinder. In a trial for Counts 1, 3, and 4, proof of the defendant's selling heroin to Mr. Lee during the controlled buy on July 6 would have been necessary to establish the defendant's identity as the distributor of the heroin that caused the victim's death. Although Mr. Lee testified that he procured the drug from the defendant, other evidence would have been required to corroborate Mr. Lee's accomplice testimony. Consequently, the offenses charged in Counts 1, 3, 4, 7, and 8 were subject to mandatory joinder. In our view, proof of the defendant's selling heroin to Mr. Lee on July 2 that resulted in the death of the victim did not impede "a fair determination of [his] guilt or innocence" as to the other offenses, and severance was not required. *See* Tenn. R. Crim. P. 14(b)(2)(A).

Counts 9 and 10 charged the defendant with possession of heroin at the house on Morrell Road with the intent to distribute or sell it. In a trial for Counts 9 and 10, evidence of the defendant's selling heroin to Mr. Lee as charged in Counts 1, 3, 4, 7, and 8 would have been admissible to prove the defendant's intent to sell or distribute the drug. Counts 9 and 10, therefore, were subject to permissive joinder to Counts 1, 3, 4, 7 and 8. The defendant was not entitled to severance, however, because the offenses were part of a common scheme of his heroin distribution business.

Counts 12, 13, and 14 charge offenses related to the defendant's possession of the gun found under a mattress in the house on Morrell Road. Evidence of the defendant's possessing heroin in the house on July 6 as charged in Counts 9 and 10 would be necessary in a trial for Count 12, possession of a firearm with the intent to go armed during an attempt to commit a dangerous felony and with prior felony convictions, to establish that the defendant "attempt[ed] to commit a dangerous felony." Accordingly, Count 12 was subject to mandatory joinder with Counts 7 and 8. Furthermore, because Counts 13 and 14 arose from the same act as that charged in Count 12, those three counts were mandatorily joined. *See* Tenn. R. Crim. P. 8(A). Again, in our view, the defendant's possessing a firearm did not cause the jury to convict him of selling and distributing heroin, or vice versa. There was no evidence that the defendant used the firearm during any of the charged drug transactions or that a firearm was involved in the victim's death, and, consequently, severance of the firearm offenses was not necessary "to promote a fair determination of the defendant's guilt or innocence of each offense." *See* Tenn. R. Crim. P. 14(b)(2)(A).

Accordingly, the trial court did not err by denying the defendant's motion to sever the offenses.

## II. Suppression

Next, the defendant argues that the evidence found inside the house on Morrell Road should have been suppressed because the police gained access to the house via a garage door opener recovered during a warrantless search of his vehicle. The State argues that the vehicle was subject to impoundment and that the garage door opener would have been inevitably discovered during an inventory search. The State also argues that the defendant had no privacy interest in the house on Morrell Road and lacked standing to challenge the search of it.

Before trial, the defendant moved to suppress the results of the search of his vehicle on July 6, 2015. At the hearing on the motion, the defendant testified that he drove a gray Pontiac Grand Prix on July 6, 2015, and that he was driving that vehicle when stopped by police. He conceded that he had no privacy interest in the house on Morrell Road and that he lacked standing to challenge the search of the house. He clarified that he was challenging only the search of the vehicle that ultimately led to the discovery of evidence inside the house. The State argued that the officers saw the defendant "take money out of a mailbox and pull heroin out" during a controlled delivery and that because the vehicle was "an instrumentality of the crime," the officers were authorized to inventory it and search it "at their leisure."

In denying the defendant's motion to suppress, the trial court ruled that the officers had probable cause to effectuate a traffic stop and that the defendant lacked standing to suppress the results of the search of the house. The court concluded that the evidence found in the vehicle was subject to inevitable discovery.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). Generally, evidence obtained as a direct or indirect result of unconstitutional police conduct will be excluded as the "fruit" of the primary constitutional breach. Under the "automobile exception," however, police may search a vehicle without a warrant "if the

officer has probable cause to believe that the automobile contains contraband." *State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009) (citing *Carroll v. United States*, 267 U.S. 132, 149 (1925).

Even if the evidence recovered from the house was the fruit of the search of the defendant's vehicle, the search of the vehicle was not illegal. Investigator Jinks saw the defendant take the marked bills out of Mr. Lee's mailbox, and Investigator Jinks confirmed that the substance that the defendant deposited in the mailbox was heroin before instructing other officers to effectuate a traffic stop. Officers followed the defendant from Mr. Lee's house and, after receiving Investigator Jinks's confirmation that the controlled buy was complete, effectuated a traffic stop when the defendant pulled into the driveway of the house on Morrell Road. At that point, the officers had probable cause to believe that the defendant's vehicle contained evidence of the controlled heroin exchange, specifically, the marked bills. Because the search of the defendant's vehicle was lawful, no "fruit" of the search is subject to suppression.

### III. Jury Charge

Next, the defendant argues that the trial court erred by instructing the jury that to convict the defendant of the charged offenses in Counts 13 and 14, they must find that he acted intentionally, knowingly, or recklessly despite the presentment charging only that he acted knowingly. The State argues that the court's instruction comported with the statute and that the mens rea of "reckless" is included in the mens rea of "knowing."

Because the constitutional right to trial by jury encompasses the right to a correct and complete charge of the law, the trial court's failure to fulfill its duty to give a complete charge of the law applicable to the facts of a case deprives the defendant of the constitutional right to a jury trial. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The trial court must provide all instructions properly raised by the proof, regardless of the instructions requested by either party. *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). To evaluate a claim of error in the jury charge, this court reviews the charge in its entirety. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

As charged in this case, "[a] person commits an offense who unlawfully possesses a firearm, as defined in § 39-11-106, and . . . [h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon; or . . . [h]as been convicted of a felony drug offense." T.C.A. § 39-17-1307(b)(1) (2014). Because this provision of the Code "does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state." *Id.* § 39-11-301(c).

At trial, after giving the parties an opportunity to review the proposed jury instructions, the trial court asked the defendant whether he found the jury "instructions accurate and complete," and the defendant responded, "Yes, Your Honor." In his motion for new trial, however, the defendant argued that the trial court's inclusion of the word "reckless" as to Counts 13 and 14 was error because the presentment charged a knowing possession of a firearm.

The trial court instructed the jury that to find the defendant guilty of unlawful possession of a firearm by a convicted felon in Counts 13 and 14, it must find "that the defendant acted either intentionally, knowingly or recklessly." This language "fairly submitted the legal issues and did not mislead the jury concerning the applicable law." *State v. Majors*, 318 S.W.3d 850, 865 (Tenn. 2010) (citations omitted). That the jury instruction did not comport with the language of the presentment does not render the instruction invalid. Indeed, inclusion of a mens rea in the presentment was wholly unnecessary. *State v. Carter*, 988 S.W.2d. 145, 149 ("an indictment which includes a reference to the criminal statute that sets forth the mens rea is sufficient to give a defendant notice of the applicable mental state"). The State's inclusion of the term "knowingly" in the presentment "cannot enlarge the essential elements of the offense." *State v. Witherspoon*, 769 S.W.2d 880, 884 (Tenn. Crim. App. 1988) (citing *State v. Hammons*, 737 S.W.2d 549, 554-55 (Tenn. Crim. App. 1987)); *see also State v. Hopper*, 695 S.W.2d 530, 535 (Tenn. Crim. App. 1985) (holding that the State did not have to prove that the defendant acted deliberately despite the State's inclusion of the word in an indictment for felony murder). Consequently, the trial court did not err in providing an instruction that comported with the statute.

## *IV. Merger*

Finally, the defendant argues that the trial court should have merged the convictions in Counts 13 and 14 because the charges were alternate theories of the same offense, noting that only one firearm was recovered. The State argues that the convictions constitute two separate offenses and that the conduct was charged under different subsections of the same statute, each conviction requiring an element absent in the other.

-14-

"It is well settled in Tennessee that, under certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications." *State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015). "Whether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness." *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

Both the federal and state constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offence." U.S. Const. Amend. V; Tenn. Const. art. 1, sec. 10. The state and federal provisions, which are quite similar in verbiage, have been given identical interpretations. *See State v. Waterhouse*, 8 Tenn. (1 Mart. & Yer.) 278, 284 (1827) ("[W]e did not feel ourselves warranted in giving [the double jeopardy provision of the state constitution] a construction different from that given to the constitution of the United States, by the tribunal possessing the power, (and of pre-eminent qualifications) to fix the construction of that instrument."). The United States Supreme Court has observed of the Double Jeopardy Clause:

> Our cases have recognized that the Clause embodies two vitally important interests. The first is the "deeply ingrained" principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." The second interest is the preservation of "the finality of judgments."

*Yeager v. United States*, 557 U.S. 110, 117-18 (2009) (citations omitted). To these ends, our state supreme court has observed that the Double Jeopardy Clause provides "three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012). "[I]n single prosecution cases, the double jeopardy prohibition against multiple punishments functions to prevent prosecutors and courts from exceeding the punishment legislatively authorized." *Id.* at 542. Our high court has also

> observed that in single prosecutions, 'multiple punishment' challenges ordinarily fall into one of two categories: unit-of-prosecution claims and multiple description claims. Unit-of-

-15-

prosecution claims arise when a defendant has been convicted of multiple violations of the same statute. Multiple description claims arise when a defendant has been convicted of multiple criminal offenses under different statutes.

*State v. Allison*, 618 S.W.3d 24, 43 (Tenn. 2021) (citing *Watkins*, 362 S.W.3d at 543-44).

Reference to the test developed in *Blockburger v. United States*, that is, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not," *see Blockburger v. United States*, 284 U.S. 299, 304 (1932), is not necessary when multiple violations of a single statutory provision have been alleged. Instead, "[w]hen addressing unit-of-prosecution claims, courts must determine 'what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment.'" *Watkins*, 362 S.W.3d at 543 (citations omitted). To determine the appropriate unit of prosecution, "we first examine the statute in question to determine if the statutory unit of prosecution has been expressly identified." *State v. Smith*, 436 S.W.3d 751, 768 (Tenn. 2014) (citations omitted). "If the unit of prosecution is clear from the statute, there is no need to review the history of the statute and other legislative history." *State v. Hogg*, 448 S.W.3d 877, 886 (Tenn. 2014). If the unit of prosecution is not clear from the plain language of the statute, "we review the history of the statute. Finally, we perform a factual analysis as to the unit of prosecution." *Smith*, 436 S.W.3d at 768 (citation omitted). A reviewing court must "apply the 'rule of lenity' when resolving unit-of-prosecution claims, meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution." *Watkins*, 362 S.W.3d at 543 (citations omitted).

Because the defendant's convictions arise from the same statute, at issue here is a unit of prosecution claim. The text of the statute under which the defendant was convicted reads:

(b)(1) A person commits an offense who unlawfully possesses a firearm, as defined in § 39-11-106, and:

(A) Has been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon; or

(B) Has been convicted of a felony drug offense.

(2) An offense under subdivision (b)(1)(A) is a Class C felony.

(3) An offense under subdivision (b)(1)(B) is a Class D felony.

Because the plain language of the statute does not specify the unit of prosecution, we look to the legislative intent to determine the unit of prosecution. *See Smith*, 436 S.W.3d at 768. The Tennessee Sentencing Commission Comments appended to the statute provide:

> This section prohibits a person from carrying a weapon with the intent to go armed. It also prohibits mere possession of a handgun by certain convicted felons and mere possession of a deadly weapon by one who intends to use it to commit an offense. Defenses to this section are found in § 39-17-1308. Punishment for these offenses is based on the seriousness of the offense and the potential for harm to others.

T.C.A. § 39-13-1307, Sentencing Comm'n Cmts. These comments identify three distinct actions proscribed by the statute, one of which, "mere possession of a handgun by certain convicted felons," encompasses both (A) and (B) of subsection (b)(1). From this, we conclude that the unit of prosecution intended by the legislature is the possession of a firearm and that the predicate felonies identified in subsections (A) and (B) are identified for the purposes of felony classification. *See* T.C.A. § 39-17-1307(b)(2), (3) (providing for different classes of felony based on the prior felony offense).

Analogously, this court held that multiple convictions under an older version of Code section 39-13-1307(c)(1) of possession of a deadly weapon with the intent to employ in the commission of an offense violated the principles of double jeopardy despite that the defendant committed two separate predicate offenses because he possessed only a single firearm. *State v. Richardson*, 875 S.W.2d 671, 676 (Tenn. Crim. App. 1993). Because, here, the defendant possessed only one firearm, his dual convictions under Code section 39-13-1307(b)(1) violate the principles of double jeopardy, the remedy for which is merger of the offenses. *See State v. Paul Wallace Dinwiddie, Jr.*, No. E2009-01752-CCA-R3-CD, 2010 WL 2889098, at *13 (Tenn. Crim. App., Knoxville, July 23, 2010) (citing *State v. Billy Harris*, No. W2003-01911-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, Aug. 4, 2004)). We remand the case to the trial court for entry of corrected judgments indicating the merger of Counts 13 and 14.

*Conclusion*

Accordingly, the trial court erred by failing to merge Counts 13 and 14, and we remand the case to the trial court for the merger of those counts and entry of corrected judgments. We affirm the judgments of the trial court in all other respects.

-17-

_____

JAMES CURWOOD WITT, JR., JUDGE